Next case will be 093080 Velma Locke with the General Services Administration. I see that we've divided the time between the two of you. I'm Wren Fowler and I'm joined by Fred Hink, co-counsel. You can argue for five minutes and then you'll be responding to, you'll be replying to the government. Yes, your honor. And you're co-counsel. Five minutes on principle.  Okay. Yes. May it please the court. I'd like to start with the charge. The competition spec in the proposal to remove noticed only two reasons to underpin the improper contracting charge. One, if the orders were outside the scope of the contract, they were new contracts subject to competition. Alternatively, if they were within scope, they were sole sources exceeding without authorization, the sole exceeding without authorization in the contract's $3 million fair opportunity threshold. Because the law of the case is that the orders were within scope, there remained only the unauthorized sole source spec. That's the only thing remaining noticed as improper. But the initial decision did not decide that. It decided only that self-marketed orders were subject to the contract's $3 million fair opportunity threshold. That's wrong, but right or wrong, that's just the contract interpretation. That means alone nothing improper. Similarly, that the orders went over $3 million says alone nothing is improper. The problem here, and where the wheels came off, is that the initial decision stopped right there and misunderstood the contract's fair opportunity $3 million threshold to be a sole source limitation. That's clear in the appendix at A4 and 5 and 43 and note 5. The agency has never said you can't sole source over the threshold. That fair opportunity exceptions apply over the threshold is admitted and acknowledged. In fact, A25, the appendix A25, the contracts say themselves fair opportunity exceptions apply over the threshold. The agency has never said that the $3 million threshold was a $3 million sole source limitation. I'd like, if I may, to move for a moment to the initial decision's treatment of SMF's H3 ordering procedures. There are ways to interpret a contract, but a credibility analysis is not one of them. The credibility determinations here are incorrect, and in reality the substitution of subjective notions for the expressed terms of the contract and the law. The credibility determinations here do no more, in any event, than father the contract interpretation on the fair opportunity threshold. That again, right or wrong, means nothing is improper. When you say that it is inappropriate for the administrative judge to rely on credibility determinations, I mean, the administrative judge does construe the contract language that was the subject of dispute between your witnesses and the government's witnesses, but you presented witnesses who said this is the way that that language should be read. The government presented witnesses who said to the contrary, and the administrative judge said, well, I think that the government's witnesses have the better of it, based both on the language and proper construction of the contract language and based on their greater experience in dealing with these contract matters. What's wrong with taking where you've introduced a question of competing experts into the case? What's wrong with the administrative judge assessing the weight of the competing experts' opinions? We really went to the history or the background of FAST, Your Honor, and some of that testimony is fine, maybe actual practice or context or something like that, but if you look at the initial decision, and the credibility determinations are really reaches. If you look at the initial decision, there's a clear abdication. The testimony is summed up, and he says, well, they say it's this, and they say that, and I must make credibility determinations to resolve this. Well, I mean, maybe it can play some role, but the initial decision then comes down to the point where he says, witness Cornell said so and so, I agree. Well, I think that's perhaps an unfair characterization of what the administrative judge has said, because on page A43, the administrative judge, moving on beyond his characterization of the witnesses' competing testimony, says, I interpret the FAST contract modification to include self-marketing efforts within the $3 million limit. I find the last sentence of the modification cannot be interpreted as the appellant has to allow self-marketed orders in excess of $3 million. The appellant's interpretation would nullify the previous language and so forth. Analyzing the language of the contract and saying this is the proper construction of the contract, isn't that the appropriate way to proceed? That would be an appropriate way to proceed, and that's the way it really should have started instead of being tagged on at the end of all of these credibility determinations that went on for several pages. And really, when he says that, it's a complete misread of that section, and also, it ignores all the other documentary evidence that should have been considered. All right, let's hear from your co-counsel. Good morning, Your Honor. To appease the court, let me begin by saying that the unauthorized sole source charge, which is the agency's burden, is legally defective. The government says that before placing her orders, Ms. Locke had already made a statement and to get written approval from the competition advocate under FAR 6-304. See appendix at 658, paragraph 5, and the government's brief at page 36. That's not so. Written approval was not required. FAR Part 6 does not apply because the contracts were tri-party contracts in SBA's 8A business development program, and these kinds of contracts are expressly exempt from justification and approval by 41 U.S.C. 253b2 and 41 U.S.C. 253f2ii. Also, the FAST contracts say that FAR 16-505b2's fair opportunity exceptions apply to 3 million plus orders. Appendix at A-125, 262, and in clause 5 of SMF's contract. The contract contained 16-505 exceptions, and Ms. Locke was obliged to follow the four corners of the document. And 16-505 itself has no requirement for justification and approval, and the agency admits that at appendix 653-54. In fact, the orders were expressly exempt by 41 U.S.C. 253ja2 in the addendum at 44 and by FAR 6001e1-6001f at addendum 32. I emphasize that because all of these sites operate as a firewall to the justification and approval requirements of Part 6. The orders were also exempt from competition under FAR 198046 because the base contracts were competed. The contracts say that they were awarded competitively. They all contain the standard clause requiring competition among 8A firms. See appendix at 274. These contracts were valued at 90 million each. At this amount, the only way into the 8A program was through competition. 198051 states, an acquisition offered to the SBA under the 8A program shall be awarded on the basis of competition. You're into your rebuttal time now, and I think we've seen that in the brief, so you better use your time in responding to the government, I would think. Thank you. Thank you, Your Honor. Thank you. Ms. Wieman. Good morning, Your Honors. May it please the Court. The decision below should be affirmed because substantial evidence supports the administrative judge's determination that Velma Locke circumvented competition requirements and failed to adhere to GSA policy when she placed the two task orders in question in excess of $18 million. In addition, because the penalty of removal was not totally unwarranted in light of all factors, the penalty should be affirmed. Petitioner makes a great deal of the fact of Clause H3 and SMF's fast contract. This is a personnel action, and the standard of review is substantial evidence. The fact of the matter is Ms. Locke admitted early on, she had stated to the Office of the Inspector General, that she did not even look at the contract, at SMF's fast contract, when she in fact placed these two orders. That's at A689 and 692 of the record. Ms. Locke has presented basically a number of post-talk rationalizations and attempted justifications for why she did not compete these two orders. The fact remains, competition was required. That was a credibility determination that the administrative judge made after hearing numerous fact witnesses, two of whom the government presented. Both of those had been involved with the creation of the fast program. There are numerous sites in the record to the fact that self-marketing without competition was allowed against these contracts up to $3 million. But above that, as opposing counsel has indicated, fair opportunity did apply. Those record sites are at 644 to 645, 655, 606. I can go on. There are, as we cite in our briefs, numerous citations to the competition requirement. As I understand it, there are two issues here. This is a self-marketing question, and whether self-marketing by virtue of H3, the last sentence in H3, you're familiar obviously with that, takes self-marketing outside of the $3 million limit. There's also the sole source issue. Help us with, if you would, or at least help me, with why it is that, particularly in light of the argument that's made this morning as to why sole source was authorized without going through the procedures that the government has asserted were applicable here. Why wasn't this a legitimate sole source procurement? First off, Your Honor, I would say that the charge itself, opposing counsel did begin with saying that there is a problem with regards to there being a sole source charge or specification. As I pointed out in the brief that the government has pointed out in the brief, the petitioner continues to conflate the charge and specification language. The charge was improper contracting transactions. If she was in fact entitled to do this as a sole source procurement, regardless of the amount, regardless of the $3 million, then that wouldn't be improper contracting without competition, correct? Right. There is a difference between self-marketing and sole source. Sure. I'm really focusing on the latter. Right. In terms of the petitioner has argued that competition was simply not required. Their interpretation is that as long as an order up to a billion dollars was brought to the agency by one of these fast contractors, I guess 90 million would be the limit, right? On their contract, correct, Your Honor. That because the contracts, petitioner claims that because the contracts were pre-competed, that that was okay, that that would have allowed for a sole source without competition. The fact of the matter is, as a factual finding, the administrative judge found, these contracts, the underlying fast contracts were not competed. The vendors were pre-qualified. There was not a head-to-head competition. And in terms of if Ms. Locke had validly sole sourced, Part 6 does say, which governs sole sources, does specifically state that there is a pre-justification requirement in writing by the competition advocate, as well as a written justification. In terms of Part 16, which governs regular IDIQ contracts, there is also, at the time that Ms. Locke placed these contracts, the FAR did still require that the contract file document what rationale was being used. There were, at the time she placed these contracts, only four rationales accepting orders from Fair Opportunity that were in the FAR. None of those was written down or set forth in the contract file. The justification that Ms. Locke put in the contract file was that she had self-marketed these orders. And the reality is, in 1999, Ms. Locke, who was involved with rolling out the FAST program for the entire Pacific Rim region, she attended two different training sessions, at which it was explained that the self-marketing opportunity for these small businesses had been changed in 1998, such that rather than having the competition threshold of $3 million, which is dictated by SBA, that's not something GSA has any control over, that that competition threshold had changed from rather only allowing sole source non-competitive orders up to $3 million over the life of the contract. In 1998, it changed such that these vendors could... of $3 million each, regardless of how much in the aggregate that was over the life of the contract. So the sole source, Ms. Locke could have done a sole source. She did not do that. She did not follow what would have been required under the FAR in terms of justifying or documenting in the record what exception to Fair Opportunity would have applied to allow her to not compete these orders. And furthermore, and most telling, is the fact that she had, just six months prior to placing the initial delivery order or task order, had attended a rollout session at which it was explained to the vendors that self-marketing was allowed non-competitively up to $3 million. But above that, there was a requirement of Fair Opportunity competition. But setting aside self-marketing, which is a sort of unique type of procurement, in which I gather that the vendor approaches the government and makes a suggestion as to a need that didn't come from the government. But setting that aside, I mean, there are certainly circumstances in which the agency through the contracting office can determine that there's really only one party that can provide competent services or products for a particular need. And there isn't, under appropriate circumstances, there's no competition in that setting. And you say that in order to do that, even in this setting, she had to go through certain procedures which were not followed. And that's the section, Part 6 and Part 16, those are your references on the procedures that needed to be followed. I can't remember the exact numbers. But that's essentially your answer to the contention that this was a legitimate sole source which could have been as high as anything within the scope of the contract. That is correct, Your Honor. And in terms of the way that the FAST program, these were hybrid contracts. So there is a bit of different parts of the FAR did apply. But the bottom line is self-marketing above the $3 million threshold was never allowed as an exception to competition. And the fact that that is the justification that she is now relying upon and had put in the contract documents in the record, the contract file, that was not an acceptable means for her to circumvent the competition requirements. And so there simply was not an exception to sole sourcing. I mean, there are set forth in the FAR specific exceptions to competition. Competition in contracting is king. It's the government wants to make certain that there is transparency in contracting. The ability for these vendors and these small businesses to self-market certain orders was a huge opportunity and supposed to give them a leg up. But SBA only gave GSA in 1998 the authority to allow non-competitive orders up to $3 million. And GSA then said, non-competitive orders up to $3 million, we can allow vendors to do that. And we will allow in addition to that for the vendors to actually self-market those orders up to that. But GSA did not have the authority to say on its own, well, we'll just let you, if you self-market a vendor, forget SBA's competition thresholds. And there are obviously numerous different iterations of the FAR, which are referenced in the briefs. The 19, I believe it's the 1998 version of the FAR, which is at 141 to 142 of the record, does set forth the $3 million SBA competition threshold. I will point out also that Ms. Locke, by her own admission and statements, she said that she referenced the FAR frequently in her work. She also said that she relied on the website, the GSA website, for information about the FAST contracts. That's at 664 of the record. And she had also said at one point that all questions about the FAR referred to her. So if she had been referring to the FAR, she would have known how to properly document and do a proper sole source. And in addition, if she had followed the training or the rollout, she would have known that she needed to open these orders in excess of $3 million, regardless of the fact that they were self-marketed, up to fair opportunity. And that's what she was required to do. In terms of the Ms. Locke also, there are numerous citations to the record indicating that at the time she did place the orders, the competition requirement would have been well-known to any contracting officer. That was something that John Cornell, who testified as both an expert and a fact witness about the general FAST program, did state. And furthermore, she has posited arguments that at some point, somehow the orders were ratified by her superiors or that if something was wrong with them, someone should have told her. In fact, she did say to the Office of the Inspector General in 2003, when the investigations first started, she had said that she thought that as long as the first order was under the competition, or under $3 million, that that was okay. You didn't have to look at the overall, the whole value of the order. And she additionally had told John Powell that the HHS deal was for $1.2 million, not mentioning the fact that the first order was actually to the tune of $8 million. In terms of the penalty, there is a great deal of deference that is shown to the agency in administering its own workforce and determining what penalties are reasonable. In Baker v. Department of Health and Human Services, the Federal Circuit did find the penalty of removal was not, quote, not grossly disproportionate where a contracting officer with 29 years of government service had given a potential subcontractor an unfair competitive advantage. Slightly different set of facts, but clearly this court did uphold the penalty of removal in those circumstances. In addition, we would note that there were, one of the things that the deciding official focused on is the fact that GSA has a very different mandate from a number of different federal agencies. Its sole mission is procurement and contracting. And the fact that Ms. Locke was a contracting officer, a warranted contracting officer, who had been told that orders of this magnitude required competition and did not follow that instruction, really went to the core of her duties as a contracting officer and made it difficult to reconcile having her continue on in her employment. And the administrative judge, in fact, noted at A4 that he found Velma Locke's ignorance of the competition requirements inherently implausible. Ms. Locke has not presented any argument for why the penalty was excessive other than relying on such things as alleged aggravators of intent and seriousness. Aggravators under MSPB law, for the most part, tend to be things like when the deciding official relies upon prior counseling or things that were not noticed. Here, the seriousness of these orders and the misconduct that was alleged was very apparent from the get-go when the notice of proposed removal was issued to Ms. Locke. And in terms of the ex parte contacts, any contacts that occurred prior to the issuance of the notice of proposed removal are outside the scope of the Stone analysis. And in terms of the allegation that there were some sort of communications involving Ms. Parks, those went certainly to the fact of the scope of the contract and were very much cumulative. Under the Stone analysis, there is a requirement that any such communications, in order to constitute a due process violation, constitute new and material information that was not noticed to the employee. That certainly was not the case here. So there was no due process violation. And for the foregoing reasons... There was one other contact, I guess, between Ms. Gladys and Ms. Ramirez regarding the question of whether the matter was serious. Yes, I believe Your Honor is referring to the record at 498. Exactly. Petitioner seems to have read a lot... I found that a little bit sketchy in the sense of limited amount of information about that in the record. What is your take on that reference at 498? Well, it seems to have been taken slightly out of context. The way that the appendix was put together, the petitioner has not cited to whose actual testimony some of this is. This is Ms. Gladys' testimony. That's what I assumed. And a lot seems to have been read into this. First off, I would note that this is a pre-charge, pre-notice of removal. This is outside the Stone analysis. This communication that they're referring to happened before the notice of proposed removal was issued. Oh, really? Yes. This was not something that was a communication between Gladys and Ramirez during the time that after Gladys had been designated as the deciding official? I don't believe so, Your Honor. I believe that this was an instance where Ms. Gladys says, I spoke to Ms. Ramirez. This was pre-charge when Ms. Ramirez was the proposing official and said, I talked about the content and process in her proposal. And they're referring to the notice of proposed removal, not to the decision itself. For the foregoing reasons, we request that the court affirm. Thank you. Mr. Fowler? Thank you, Your Honor. Your Honor, the administrative judge made no finding that the FAST contracts were competed. In fact, everybody except Cornell, who admits he has no corroboration for his theory that they were not competed, says they were competed. And as Mr. Hink said earlier this morning, the contracts say they were competed. The agency promotional material says they were competed. They were sold to other agencies as pre-competed contracts. And in fact, the proposal notice at Appendix 65 says they were competed. Let me see if I understand this, because we've spent a little bit of time on this and I may have a misapprehension, so correct me if I do. In order to be in the program, the FAST 8A program, I want to get into the program, so I submit an application, along with a lot of other people, and I either get turned down or I get accepted. Is that the sense in which you're saying that the contract was competed? I became eligible for participation? The contract clause that Mr. Hink cited before restricts or limits or requires competition among 8As. They're already in the program. And just getting into the program or qualifying to be into the program is not competition. I'm in the program. Now, what exactly is it that you're referring to as to the contract being competed, the $90 million contract? The proposals out there, or the SFOs out there, and the 8As have to come in and submit a proposal. And the evaluation material is in the SFO and the contract. It's in the appendix. And that included, amongst other things, a competitive price range. So they had to come in and show how they could satisfy the requirements under the FAST contracts and what their prices were. And how many of them became eligible for orders under the contract? Well, there are about 200 FAST contracts, 156 FAST contractors. Some of them had both a Kansas City and a D.C. contract. And the record indicates maybe about 800 people are contractors submitted proposals. What I'm trying to get at is how many... When Ms. Locke was sitting down and deciding, I have an order here. Who will I give it to? How many choices were there? Well, if it's... Pursuant to this contract that had been competed. Oh, there was 156 contractors that Ms. Locke could issue orders to. You normally say the contract was competed. You say everybody sent in bids in response to the solicitation and one person won. But that's not the situation here. No, no, no. These are multiple award IDIQ contracts. And 156 AAs got the contract. Right, so she could have picked any of 156 under the contract, right? Yeah. Okay. Yeah. I understand. But we're talking about competing the base contract. The $90 million... Yes, yes, yeah. Okay. Surely your position can't be that she was then completely free... No, no. ...to send $90 million to one of the 156... Oh, no. ...on a whim. No, no. Just because she thinks that they were probably the best and she... Over $3 million. If it's not self-marketed, she has to put a request for proposal out. Right, and she didn't do that, right? No, because it was self-marketed. And SMF is the only FAS contractor certified to install TIPOLI. So your argument really does come down just to the self-marketing, right? No. No. SMF, who got the order, is the only contractor, only FAS contractor certified to install this kind of software. So you're saying that they were sole-sourced? Oh, yes, yes. But I think you just said that she didn't do the paperwork that would have been required... No. ...to justify the sole-sourcing. Your Honor... Because she went the self-marketing route. Your Honor, that's the government's burden. They didn't even file the contract file. We reconstructed most of the contract file, and it does meet 16.505's documentation requirements. 16.505... For sole-sourcing? Yes, it does. So you say both sole-source and self-marketing... Yes, yes. ...are alternative grounds, and sole-sourcing was satisfied. Absolutely. We reconstructed the contract file to the best that we could. Now, there's documents missing, but it's in the appendix, and there's a single-source justification in there. We reconstructed that file, Your Honor, and it's their burden. It's their burden to prove no authorization. And in fact, 16.505 does not even have an authorization requirement in it. They're going to six for the authorization requirement, and you can't get there. All right, sir. Thank you. The case is submitted. All rise.